Your Honor, this final case of the day is called 210-1088, Deborah Seyler. Her capacity is Kane County Clerk of the Circuit Court v. County of Kane at the Hall. On behalf of the Avalon, Mr. Dean Frieders. On behalf of the Avalon, Mr. Sam Vincent. Mr. Frieders? Mr. Frieders? You may proceed. May it please the court. The court's going to have the benefit of my week of laryngitis today to keep my comments, I think, directly to the point. Fundamentally, the part of the case that we're in right now is not about the question of whether or not funds should be spent to keep the circuit clerk's office open. The question that's before this court is simply a question of the source of those funds, whether those funds are to be general revenue funds or what we're calling in this case special funds, funds that by statute are restricted in the purpose for which they can be spent. Essentially, there are two different types of special funds at issue here. One type encompasses the document storage and courtroom automation fund. Both of those funds are created by statutes indicating that they may be used to pay the costs of establishing and maintaining those respective systems. Establish and maintain a document storage system, establish and maintain a courtroom automation system. Well, let me ask a question. Assuming that there are persons, and I think the record reflects that there are persons who do that work, and the clerk has assessed certain parts of those special fees for their salary and for the maintenance of the work, what if those people are ill? Both of them are ill for a week. They have shingle laryngitis, and they can't come into work. Who does that work? Does it just sit there? Well, it's contingent upon the staffing available in the clerk's office. But somebody else may do the work, but they may be getting paid by general funds, if I understand what the argument is here. I think based on the testimony that was presented to the circuit court, the staffing of the circuit clerk's office is such that when they have absences, when they have people that aren't attending, that work is backing up. The circuit clerk testified that when they have absences from normal courtroom deputies, they're having to take supervisors and managers and put them in the courtrooms. So I think the special fund work, if someone isn't available to perform that because of an absence, it's simply not being done. Even though they're being paid for it because their salary is allotted from those amounts. And that work is being done when a person returns back into work. I would expect, although it's not on the record before the circuit court, but I would expect that that would be a relatively de minimis part of the larger calculation that we're talking about in terms of whether or not special fund or general fund expenditures are appropriate. Now it's your position, isn't it, that the special funds are being used as aggressively, as lawfully allowed with 32% of personnel expenditures being allocated to the special funds. What specifically do you rely on to adjust, to support your position that it would be unlawful to increase that percentage? The restrictions within the special funds themselves taken at their, if you just read them and take them at their express language, applying basic statutory construction. As I indicated, the documents on automation say establish and maintain. The court administration is only for those additional expenses incurred to collect. So maintain you define as just upkeep rather than and rendering something new or updating it as opposed to just data entry, for example, data entry functions. I think had the statute been intended to cover all operations associated with a, for example, document storage. If they had intended to cover any expense related to that, they could have simply said any expense related or they could have said the costs incurred in operating the system. But the statutory construction that the statute as it was written said the cost of establishing, which is very clearly those costs of putting the system together and maintaining. Which taken at its ordinary meaning means the cost of maintaining, of repairing, of keeping the system serviceable. And it doesn't contemplate the cost of, on a daily basis, having people operate or interact with the system. Could you repeat your first sentence, which started with, it's not whether the funds are general or special should be spent? Well, if it isn't that issue, what is it? The issue isn't whether funds should be spent or not. The issue is whether it's general purpose or special purpose funds that will be spent. Well, your points and authorities suggest that the issue or standard on review is whether or not the trial court abused its discretion in the grant of an injunction. It has nothing to do with what you just said. And so my point to you is if you want to make a connection between what you started in your first comment and suggest that based upon a statutory interpretation, it could only be interpreted in one way, in which case the trial court abused its discretion in granting the injunction. But right now I'm concerned, and my concurrence or dissent will relate to the issue of whether or not the trial court abused its discretion in the grant or denial of an injunction. That's what the Supreme Court rules relative to an interlocutory appeal relate to. They don't relate to whether or not this money that's going to compensate people or keep the office open comes from a particular fund. That isn't what I'm here for today. And directly to that point, Your Honor, the error that the circuit court made in entering the injunction that it entered was on this point. The circuit court entered a blanket injunction just saying spend special funds without providing any definition as to how those special funds should be spent or what special funds should be utilized or what expenses they should cover for that matter. But the clerk's argument was that I need more money, you know, to keep the office open. So the court said spend what funds are available to you to keep the office open. And what the court said, it didn't say spend what funds are available to you. It said spend special funds. Well, those would be the ones that were available to her because she was complaining she didn't have any others. So those were the special funds to keep the office open. What's the problem with that? Your Honor, I would contend that what the circuit court did, assume for a moment that there's a special purpose tax money that is just for the purpose of funding the dog catcher. And what the circuit court did was say, circuit clerk, you're out of money, but the dog catcher has some. Use the dog catcher's money. The circuit court ordered the clerk to spend funds that had a restricted statutory purpose in violation of that purpose. But there were funds under her control. There were funds that were held by the county that are accessible and are intended to be used for restricted purposes within the circuit clerk's office. And, again, she was ordered to just spend those blindly without any definition or direction as to how they were to be spent. And she was ordered to do so under circumstances where she had come in and said, I know those funds are there. I know that they've been appropriated. But I can't lawfully spend them because I'm already spending every dollar that I can living within the statutory definitions. Well, wouldn't the county then step in and direct how they were to be spent for the allocation? Your Honor, if the problem, though, is that the funds can't be spent, that we've reached the lawful limit. Well, you're saying that the trial court made a mistake. Yes, Your Honor. What I'm saying is that the circuit clerk and all of the evidence, the evidence that was presented was one-sided. It was just the circuit clerk's statements and just the circuit clerk's evidence as to the operations of her office. And that testimony and the affidavits that were submitted established that we reached the statutory limit of what we can use special funds for. And that's where the problem lies. If that limit had not been reached, there would not have even been a need for the underlying lawsuit. What is the alternative solution to this enigma? The alternative solution in terms of the preliminary injunction is- No, right now I'm not concerned with the preliminary injunction. We're talking about cutting the Gordian knot and saying, okay, so special funds should be used for special things and general funds should be used for general things. What relief is your client seeking insofar as mandamus, transfer from the general fund to her special funds, or transfer from the county general fund to her general fund? What is your client seeking as far as relief is concerned as an alternative? Well, ultimately, Your Honor, there are not loans permitted from the special funds. They're restricted to their limited purposes. So I think the ultimate relief has to be additional general funding from the county. The county has to fund all of its mandated services at some minimum level before it can step outside and start funding discretionary services. And the county has, in this case, filed a verified answer admitting that they're funding discretionary services. And they're doing so at a time when the circuit clerk is coming forward and saying, I cannot get my work done. I cannot accomplish statutory mandates with the level of funding that I have in the general fund right now. That question, the question of at what level must these services be provided, is obviously a difficult one and one that Illinois courts have really not wrestled with. The circuit clerk statutes obviously contemplate funding at a reasonable and necessary level. But that doesn't really inform us about what constitutes a reasonable and necessary level. Well, are you suggesting that the additional funding that is supposed to come from the county, I assume the general fund, is supposed to be paid out of the county general fund based upon what you, I believe, said was a mandated duty or responsibility to maintain the circuit clerk's office? Yes, Your Honor. Does that then mean that we're talking about a mandamus here filed by your client against the county board? One of the accounts that is at issue is an account for mandamus, Your Honor, yes. In the ultimate, the case in chief. With respect to, with respect to the question of at what level must the services be maintained, the best answer that we've come up with is by looking to another court that has wrestled with this exact issue. At a speed between a county and its elected officials about the level at which mandated services have to be funded. Those are the Michigan cases that we refer to in the briefs, particularly the Wayne County cases where they adopt the term serviceability. Serviceability is their catch-all term for the minimum reasonable level at which mandated services can be provided. And what they talk about are, it's a level where you're avoiding cascading or growing delays. The easiest way to understand it is if you accept that the circuit clerk's desk has paper coming in and paper going out. If you file something with the circuit clerk and her employees are able to immediately grab it and handle it, that's optimal or maybe even better than optimal. If you're giving them a piece of paper and it's going in a stack and at the same time they're taking a piece off that stack and they're keeping up with their workload, then that may be a reasonable level of service. And if that workload has a backlog that they're two weeks behind but they're keeping up and they're holding steady at two weeks, that's probably a serviceable level. The problem is when you get so many filings coming in that the backlog is two weeks today and next week it's four weeks and the week after that it's six weeks. That's the cascading, growing delay that the Wayne County cases talk about where they say the county is not funding its mandated services at a serviceable level. Because the county officers aren't able to fulfill their mandates. They have these growing delays and that's exactly what the circuit clerk testified happened here. When she attempted to comply with the county's restricted general fund budget, when she attempted to have a number of employees that were permitted by that allocation, that appropriation, she had growing delays. She was seven weeks behind on processing child support payments. She was many weeks behind on reporting DUI convictions, on reporting traffic dispositions to the Secretary of State. I think it's important that we look at the purpose for which those mandates were established. We report traffic convictions to the Secretary of State so licenses can be suspended or revoked, so unsafe drivers get off the road. If that reporting isn't happening for a period of weeks and a growing period of weeks after the convictions occur, those mandates aren't being performed. Isn't it up to the circuit clerk to live within the budget that the county appropriates for her office? I don't think it can be quite that simple, Your Honor, in that the county has an absolute non-delegable duty to fund the reasonable and necessary expenses. If the county came forward and said, we're going to give you $10, circuit clerk, to fund your operations for the year, then certainly the circuit clerk could come forward and say, this doesn't satisfy the mandates. In accordance with the Pace versus Regional Transit Authority case, where this court said, we're going to review funding decisions by governmental agencies and make sure that when you're deciding how you're going to fund things, you're complying with your mandates. That's what we're asking here. Now, here, obviously, the county hasn't said, here's $10. But there is a dispute, nonetheless. And the circuit clerk has said, I have pushed it and stretched it as far as I can. The amount that they've reduced this, in a time when her caseload, the number of documents filed, have increased by over 30%, they've cut her general fund budget by almost half a million dollars. She's dealing with more cases, more caseload, additional judges in Kane County, and all the various and sundry additional work that was laid out before the circuit court in a time when the county is cutting her general fund budget. And she's attempting to comply with that, but reached the breaking point where it wasn't possible, where she was having those cascading delays, where she wasn't performing mandates. And where she faced a choice of either saying, I have to add more staff and do those things that the law requires me to do, and try and compel the county to do those things that the law requires it to do, namely fund my office at a reasonable level. Or I have to live with the county's funding and just not do my job, not follow court orders when they say report this to the Secretary of State, or when they say forward this payment to a child. The circuit clerk, looking at that decision, came into the court and said, I'm stretched as far as I can. I'm using the special funds as far as I can. Let me finish, Your Honor. Do you want to finish at this point? Any other questions? I don't right now. You'll have time for both. Thank you. Mr. Benson. Your Honor, may I please the court? I'm Sam Benson, appointed by the chief judge with my partner, Sheriff, and special state's attorney representing the King County and the King County board. It's counter plaintiff and defendants in this lawsuit. The standard of review in this case is clearly an abuse of discretion, whether the entry of the preliminary injunction did in fact abuse discretion or did not. The circuit court was faced with a complex, difficult, and emergency problem. The circuit clerk had filed a lawsuit saying she didn't have the money to keep the circuit clerk's office open and therefore to keep the courts open. And we had filed a subsequent lawsuit or a subsequent response with a counterclaim saying that, in fact, she did have the money to keep it open, that, in fact, there was adequate money that had been appropriated to her, and that it was unnecessary for the court to order the payment of unappropriated money. Then why did it? Excuse me, sir? Well, there's a preliminary injunction. Yes. The clerk was the plaintiff or the petitioner and your client is the respondent. Yes. It would appear that an injunction was entered that you are the appellee and she is the appellant, which means that either she requested something that she didn't get, which you like, or you requested this preliminary injunction. Yes, sir. And you liked it and she didn't. Yes, sir. So is this preliminary injunction a result of your request or her request? It's a result of our request, sir. Okay. So what's the probability of your success on the merits? I think our success on the merits is very likely. I think our success on the merits... Well, you're confident, at least. Well, Your Honor, it really rests with you, clearly. No, I don't think it does. I think it rests with the trial court because until he makes findings of fact and a final judgment, I don't know that I'm going to make a final judgment either. Go ahead. The circuit court confronted two questions in this hearing. It confronted the question of whether a deliberative constitutional process, statutorily consistent process, had occurred in the appropriation of funds. And it also necessarily dealt with the question of whether the special funds that were appropriated could constitutionally and statutorily be used for the purpose of keeping the courts open. And if that were the case, it was natural for the trial court to then order a ruling that the circuit clerk should use those appropriated special funds, if they were lawfully ordered, for keeping the courts open and keeping the circuit clerk's office open. The county put on four fact witnesses. The county put on the county's finance director, Cheryl Petelli, the county's payroll administrator, and the county's special stakes attorney, Ken Shapiro, who advised the council on civil affairs during the course of the appropriations process. And in addition, the county put on the circuit clerk. Yes, the county put on the circuit clerk to testify. Further, the county introduced 12 trial exhibits. Most of those exhibits dealt in detail with the appropriations process and with the budget process and with the money available to be spent. King County had adopted a budget. It had adopted a budget with an appropriation for the circuit clerk's office that was $1 million greater than her actual expenditures from the prior year. The clerk, in fact, the circuit clerk testified to the fact that the budget was $1 million greater than her previous year's expenses. The clerk testified about the functions of her courtroom deputies and about what they did and what the filing counter deputies did. And what she said was that they regularly accessed the computers, that they regularly entered information into the computers. And by affidavit, the clerk attached to the clerk's motion in her request for the preliminary injunction, the clerk had noted that the deputy clerks were heavily burdened by the automation system and their responsibilities for dealing with the automation system. Mr. Shepard, the special state's attorney dealing with the county board, testified that in May and in June and in July, the Judicial and Public Safety Committee had heard from the clerk and that she had requested more general fund money for her budget. But she was never, they were never given any substantiating detail to explain why more money was required from the general funds. In August, the Executive Committee heard the same request, and again, there was only a draft resolution that would have empowered the expenditure of money, but no substantiating detail to explain it. So there's nothing that says she was asking for more staff or that, in fact, she was going to use existing staff, but maybe extend hours and that would encourage, or that would increase the level that had to be paid? There was some testimony that she needed additional staff to meet her mandates, but there was never substantiating detail to explain how the staff would be used or what the problem with the mandates was, or how much was needed, or why the special funds could not be expended for this kind of a process. Counsel, opposing counsel indicated or articulated that it's his position that the trial court made a mistake in interpreting the legal reach of these special funds. Do you agree with that, or do you disagree, and why? I think the plain language of the special fund statutes answers that question. I disagree with it, and I think the plain language disagrees with it. Well, it says establish and maintain, correct? The plain language, the establish and maintain sentence that counsel has discussed doesn't say anything more than that the county shall bear the expense of establishing and maintaining an automation system or a document recording system. It does not say anything about restrictions on those funds. If you go down two sentences later in the statute, there are restrictions. What the statutes both said is that the county board shall direct expenditures, and that those expenditures may be for computers, for hardware and software, and for personnel related thereto. Personnel related to automation and personnel related to document storage. In fact, the Attorney General of Illinois has issued advisory opinions to various county boards on these subjects. In one of the opinions, the Attorney General clearly says, and this is brief, the Attorney General clearly says that data entry personnel may be charged against the automation system. In another case, what the Attorney General says is that the document storage system may buy computers, laptop computers for judges, and the reasoning is instructive. The reasoning is that computer systems, information systems, are available for use. Data entry and data extraction is the purpose of an information system. And if you can't use the system, if you can't be recompensed for using the system, then what's the purpose for the system to begin with? The Supreme Court has dealt with this issue. In the Puchinski case, the Supreme Court rather directly dealt with the matter. The Supreme Court said that on this matter, county boards control the appropriations. These are appropriations that should be treated like any other appropriation for expenditures by the county board. And it paraphrased the statute. This was a decision on the document storage fund. It paraphrased the statute to say that expenditures could be charged to the data storage fund for hardware, for software, or for that matter, for personnel related thereto. So when you then look at a situation where the circuit clerk herself, and an affidavit before the court, has said that her deputy clerks are heavily burdened by the computer system because they have to enter and extract data from it, it's perfectly natural to charge some of those. But if you look at the charts that were introduced by the county, I speak of county exhibit number 14, which shows how each employee is allocated by fund for payment. There are 89 deputy clerks in her office at that time. This was three-fourths of the way through the fiscal year. And of those 89 clerks, zero were allocated to automation. Not a single one. Despite the fact that she had sworn in her affidavit that they're heavily burdened and they use the automation system often, and despite the fact that the statute says that personnel related thereto may be charged against the automation fund. The fact of the matter is that when you look at all of the clerks in this system, all of the deputy clerks... When you say charged against the fund, what fund specifically are you referring to? The county automation fund, or is there some clerk's automation fund? Under the clerk's statute, there is authorization from the General Assembly for an automation fund if the county authorizes it. And that statute then says that the county may authorize a fee, it limits the fee in size, I think the max is $15, and says that has to be paid into a special fund. Well then, when you referred to the automation fund as the county automation fund, did you mean that it was really the clerk's automation fund? I think that would be a fairer description, sir. I think that's correct. And who runs the computer system for the county of Kane? If we're talking about the automation system that is involved in this case, it is run by the circuit clerk's office. Okay, there are other counties where the county runs the computer and the clerk has access. In your situation, or in Kane County's situation, the circuit clerk has her own computer? That's correct. To come back to the Justice's previous question, at the time of the hearing, the clerk and the clerk's counsel argued that 32% of the total personnel expenditures of the office were billed against the special funds. In fact, if you review County Exhibit No. 9, which shows exactly how much had been expended from each fund to that point in the fiscal year, 27% of total personnel expenditures had been billed against the special funds. 27% from 32% is 5%. In this case, it represents $300,000. It's a material number because the total number in dispute in this matter is about $500,000. So there is clear evidence that the court heard and analyzed and considered the process by which the county board adopted the budget. There's substantial evidence about how the court reviewed whether the county had performed its function under the budget. There's evidence that the clerk had ample opportunity to present evidence about her budget and request more money, but did not do it with any detail. In what is obviously a competitive process, budgets are difficult things these days. There's substantial evidence, substantial legal opinion to Attorney General's opinion and a Supreme Court opinion to support the use of the special funds for these kinds of personnel. More than that, more than anything else, there's the circuit clerk's own testimony that her deputy clerks in the courtroom and at the filing desks used the automation system and used the document storage system. And that both of those funds, that the automation system had no cost billed against it for personnel, none. The document storage system had seven, seven out of a total of 89 deputy clerks. So you have a situation here where the judge was faced with the problem of how to keep the courtroom open on the Monday next. He had to find a way to do that. That was a constitutional requirement in essence for him. So he chose to determine that the special funds under these circumstances could be used to make up the shortfall. They were appropriated money. They say that they can be used for personnel related to automation. They say they can be related to personnel related to document storage. And as a consequence, he entered an injunction. Well, who's to determine how much comes from each fund? I beg your pardon, ma'am? Who is to determine how much comes or should come from each fund? That was something counsel mentioned. Well, the... There was nothing provided. I believe the real issue there is that the circuit clerk can exercise judgment on that matter. Now, on one of the funds, the circuit clerk must then go to the chief judge. On the automation fund, she must get clearance there. But the fact that the circuit clerk was concerned about and had not used the special funds does not mean that we should deprive the circuit clerk of all discretion and judgment in running our office. For the judge to let the circuit clerk make a final decision after saying, use the special fund money, that's a perfectly reasonable thing. Well, she had used one of the funds, had she not? Wasn't there 32% of personnel? She had used some funds, but she had not used the automation fund at all. And there was the potential to use the other funds to a greater extent. Are there any limits at all on the percentage that these funds may be used? I don't believe that you could use the automation fund, for example, for expenditures wherein a clerk, a deputy clerk, was not doing anything at all related to automation. But if the deputy clerk was doing something related to automation, yes, I think you can charge those expenses. And I think that it's clearly a delegated judgment. It's a delegated judgment first to the county court and then to the clerk. Thank you, sir. Thank you, counsel. Mr. Frieders. I think Mr. Vinson was correct that the center of vigor is abuse of discretion, which means we have to evaluate whether the circuit court acted against the manifest way of the evidence. And our position here today is that it wasn't just against the manifest way of the evidence. It was against all of the evidence. Counsel, could I interrupt you and suggest to you that the analysis is twofold. The alleged findings of fact that the trial court made are measured by the standard called the manifest way of the evidence. And assuming that the findings of fact are not against the manifest way of the evidence, then we look at what the underlying facts are, look at what the trial court did, and then determine whether or not no reasonable person would have done what the trial court did. That is the standard by which you measure an abuse of discretion. So, assuming that what Mr. Vinson suggested was correct, things like there are 89 employees and not any percentage of the automation fund apparently was allocated. At least that's what I thought I heard him say. And the trial court suggests that maybe allocated funds should be used or there should be allocation of the special funds. Please explain how no reasonable person would have made that decision. The reason no reasonable person could have made that decision, Your Honor, is because what Mr. Vinson told you is incorrect. And the record before the court shows it is incorrect. So the underlying facts upon which the judgment was based was wrong? Yes, Your Honor. Okay. The testimony that Mr. Vinson spoke of came from a number of individuals, each of whom was a representative of the county and each of whom testified. Could I interrupt you before you elaborate and just ask you this hypothetical? Assuming that we determined that the facts upon which the trial court rendered its decision are not against the manifest way of the evidence, would you concede or not concede that it was not an abuse of discretion? Your Honor, even if the facts were correct, I think the order that was entered that just said spend special funds without any further definition still constitutes an abuse of discretion. In what way? It's too narrow or it's too broad? It's too broad. It gives your client as much discretion as he possibly could, which means that if you were a horse, he was basically giving you free rein. Now you're telling me that that is an abuse? Under circumstances where the clerk comes in and says I've maxed out those funds, I'm up against the limit, and if I spend anything more out of court automation, I'm going to be breaking the law. And the judge says use special funds and doesn't say I think you can use more court automation because based on my review of these facts, I think that the definition is more expensive than you're considering or your people are doing more work than you're acknowledging. Just saying use special funds doesn't give the circuit clerk free rein. It gives her more rope to hang herself. It doesn't give her any protection from the very issue that she was coming in seeking protection from. Are you talking about for purposes of determining contempt or are you talking about for the political ramifications that might arise from such a decision? I'm talking about for purposes of determining later whether or not the circuit clerk violated the law by using special funds. Well, but isn't intent crucial in that? If you're talking about official misconduct, I mean, there has to be intent. I don't know how this situation could even ever result in intent. But in terms of a preliminary injunction, the question is before the trial court is the balancing of the harms. Which is more potentially harmful, spending general fund dollars or spending special funds? That isn't the question that I broached or the issue that I raised. The point is that if the preliminary injunction is so open-ended and gives your client the ability to decide what ratio, what allocation, what portion, et cetera, it would make I think your opponent's attempt to hold your client in contempt much more difficult because your client could say I have complied with this order because this order never said to me I have to spend 37.5 percent of the allocated funds on automation for automation and I have to spend 67 or 68 percent, whatever the judge decides, for the other fund. So your client, by this preliminary injunction, other than the fact that she is going to have to spend funds from special funds that she doesn't want to spend, she is given about as much free reign as she possibly can. So except for the idea that the trial court has quote-unquote forced your client to spend special funds, I don't see how anybody, especially your client, could claim that it was an abuse of discretion except only in that one instance because there is so much discretion given your client except for the one point and that is it's got to come from special funds. But he's not telling her how much, so how are you going to be found in contempt of court if she spends 25 instead of 35? May I respond, Your Honor? Sure. I'd be interested. I think the first response that I'd have to make is to take issue with the underlying assumption that the circuit clerk's facts were right. Again, what the county argued today about 89 employees ignores the fact that the circuit clerk has 121 employees. They write off 32 of her employees off the bat without justification. The circuit clerk testified that she has courtroom deputies who accept filings and then they take them back to the office and hand them to someone else. The clerk has employees who are sworn deputies of her office, who are among the 32 of the counties not counting, whose job is to scan documents all day. So the courtroom deputies take the documents back and give it to these people and they scan documents all day and 100% of their salary is allocated to special funds. And the county writes some out of the balance and says we're not going to count them, we're just going to look at the 89 that go into courtrooms on a daily basis. And they do that on the basis of testimony from people who admit they have no idea what happens in the clerk's office. And they do it after filing a verified answer where they admit the county has no idea what happens in the clerk's office. Is that because the clerk hasn't provided the evidence? Your Honor, the clerk, in terms of the presentation before the circuit court, the clerk provided her affidavits and her testimony. And she also provided written statements that she had made to the county before the passage of their 2010 fiscal year budget where she explained these issues in detail. Where she laid out the seven week delays that she had in processing child support payments and where she said the exact arguments that we're here saying today. I'm at the end of my rope. I've exhausted my special funds as far as I can spend them. I need more general fund dollars. I can't do it with the number of employees that I have now. Well, if she's behind on the child support payments, why can't she, is it because they're not entered? She hasn't made the appropriate entries so that she can make the appropriate disbursements? And if it's because the entries aren't done, why can't she hire somebody with those special funds to make the entries? With respect to that specific issue, I believe it's actually the processing of the payments. It's not simply the entry of the electronic records. It's accepting the payments and redistributing them, redisbursing them out to the intended parties. Well, you've got to record them somewhere. Are we recording them in big logs with the, you know, candles? Or how are they being recorded? I can't profess to know that, Your Honor. So, if I understood your response, there are 132, 41, I believe, is 41 and 89? 121, Your Honor. 121. Okay. So, 21 and 11, correct? 121 deputies. The county is talking about 89 of them. Right. And the 32 that they exclude are the people who spend the vast majority of their time. So that's 32 employees that are running amongst the courtroom. No, that's 32 employees that are spending the vast majority of their time doing special fund work. Okay. Now, if you take the 121 employees and look at every penny that's spent on compensating them, 32% of every dollar spent on any personal expense in the Circuit Court's entire office is coming out of these special funds, even though they have these limited purposes that we've talked about today, the limited purposes that the Attorney General acknowledges in their opinions. And how much of the special funds have been expended for the year? There remain fund balances. I don't know what they are off the top of my head, but the fact that there do admittedly remain fund balances, the fact that money's there doesn't mean that it lawfully can be spent. And it's there sufficient to meet the shortfall, correct? The shortfall is somewhere near half a million dollars, and there were sufficient monies in those special funds to meet that amount, correct? If we don't address other things that it was intended to be spent for, the projects for which it was being accumulated, and if we ignore the statutory restrictions. Well, there's nothing in the record regarding the projects for which it was being accumulated, is there? No, Your Honor, there's not. Okay. But the gross number of dollars that's present is adequate if you ignore the statutory restrictions. Okay. And for those reasons, we request a relief to Scribner. Any other questions? No. We'll take the case under advisement.